UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 1/19/10

- - - - - - - - - - - - - - - - -x

L-7 DESIGNS, INC.,                    :

             Plaintiff,               :    **OPINION**

        - against -                   :    09 Civ. 1432 (DC)

OLD NAVY, LLC,                        :

             Defendant.               :

- - - - - - - - - - - - - - - - -x


**APPEARANCES:**         WINSTON & STRAWN LLP
                         Attorneys for Plaintiff
                              By:  Virginia R. Richard, Esq.
                                   Joseph A. DiBenedetto, Esq.
                         200 Park Avenue
                         New York, New York  10166

                         DEBEVOISE & PLIMPTON LLP
                         Attorneys for Defendant
                              By:  Bruce P. Keller, Esq.
                                   Shannon Rose Selden, Esq.
                         919 Third Avenue
                         New York, New York  10022

**CHIN, District Judge**

          In this case, plaintiff L-7 Designs, Inc. ("L-7") and
defendant Old Navy, LLC ("Old Navy") entered into a Creative
Services Agreement (the "CSA") whereby L-7 was to provide Old
Navy with creative design services, including "input" on
"creative positioning, creative vision and creative strategy."
Old Navy moves pursuant to Fed. R. Civ. P. 12(c) for judgment on
the pleadings dismissing the first amended complaint (the
"Complaint").  For the reasons that follow, the motion is granted
and the Complaint is dismissed.

## A. **The Facts**

The facts set forth in the Complaint are assumed to be true for purposes of this motion. Additional facts are drawn from the exhibits attached to the Complaint and to Old Navy's answer to the first amended complaint and amended counterclaims (the "Answer").[1]

### 1. **The Parties**

L-7's principal, Todd Oldham, is an artist, designer, photographer, writer, and television personality. (Compl. ¶¶ 8-11). He formed L-7 in 1989 to manage his design services and intellectual property rights. (Id. ¶ 7). Over the years, Oldham and L-7 have marketed merchandise under the brand TODD OLDHAM. (Id. ¶¶ 8, 9, 13). L-7 is the owner of certain federal registrations for the mark TODD OLDHAM. (Id. ¶ 19).

Old Navy, a subsidiary of Gap Inc., operates a chain of retail apparel stores, with more than a thousand stores throughout the United States and Canada. (Id. ¶ 20). For at least the last five years, Old Navy has been suffering declining

---

[1]    On a motion for judgment on the pleadings, a court may consider the exhibits attached to the pleadings, and any documents incorporated therein by reference. See Prentice v. Apfel, 11 F. Supp. 2d 420, 424 (S.D.N.Y. 1998) (citing Brass v. Am. Film Techs., Inc., 987 F.2d 142, 150 (2d Cir. 1993)). "A complaint is deemed to include any written instrument attached to it as an exhibit, . . . materials incorporated in it by reference, . . . and documents that, although not incorporated by reference, are "integral" to the complaint." Sira v. Morton, 380 F.3d 57, 67 (2d Cir. 2004) (citations omitted).

sales.  (Id. ¶ 22).  One strategy for increasing sales was to try
to appeal to younger consumers.  (Id. ¶ 23).  In the spring of
2007, L-7 approached Old Navy to discuss the possibility of
entering into a relationship with L-7, and Old Navy decided to
engage the services of Oldham and L-7.  (Id. ¶¶ 24, 26).

    **2.**    **The CSA**

On September 21, 2007, Old Navy and L-7 entered into
the CSA.  (Id. ¶ 28 & Ex. 1).[2]  The CSA provided that Old Navy
was engaging L-7 to perform certain "Services" and to provide
certain "Deliverables," as set forth in a "Scope of Work" (the
"SOW") attached to the CSA.  (CSA § 1).

The SOW provided that Oldham would provide services for
Old Navy as "Design Creative Director," and that L-7 was to be
paid an annual consulting fee for three years (running through
September 30, 2010) as well as certain bonuses.  (SOW §§ 1, 2).
The CSA provided that the fees to be paid pursuant to the SOW
covered all "Services and Deliverables" and "all ownership
rights, assignments, licenses and transfers by [L-7] set forth
herein."  (CSA § 2(a)).  The CSA gave Old Navy, for example, the
limited right to use the TODD OLDHAM marks in connection with the
parties' "relationship" with each other.  (Id. § 3(c)).  The CSA
provided, however, that the fees were "not intended to cover
payment for ownership rights, assignments, licenses and transfers
related to the Todd Oldham branded line of products described in
the SOW."  (Id. § 2(a)).

---

[2]    By its terms, the CSA is governed by New York law.
(Compl. Ex. 1, ¶ 14).

-3-

## 3. **The Licensing Agreement**

Section 5 of the SOW was entitled "Todd Oldham Branded Line," and it provided as follows:

> a. In September 2007, the parties will announce publicly that Todd Oldham/[L-7] shall be serving as Design Creative Director of Old Navy and that it is the intent of the parties to develop and launch a line of products that will bear TODD OLDHAM Marks to be sold exclusively at Old Navy stores at a future time.
>
> b. [L-7] and Old Navy acknowledge and agree that the specific terms and conditions related to this proposed line of products bearing TODD OLDHAM Marks are to be negotiated and agreed upon by the parties in a separate agreement. The parties plan to enter into a separate agreement related to these products by October 1, 2008.
>
> c. The parties agree that this separate agreement will contain at least the following: (1) royalty fees paid to [L-7] of 5% of Old Navy's retail sales for this particular line only (not all Old Navy products) and (2) agreement and final approval by both Old Navy and [L-7] as to the collections and products to be sold by Old Navy.

(SOW § 5).

On September 21, 2007, Old Navy issued a press release announcing that it was going to launch a TODD OLDHAM branded line of products. (Compl. ¶ 36). Thereafter, L-7 and Oldham performed their obligations under the CSA, and Old Navy executives gave positive feedback. (Id. ¶¶ 38-43).

In April 2008, L-7 "initiated negotiations to finalize the remaining open terms of the license agreement for the TODD OLDHAM branded line of merchandise, as required under Section 5

-4-

of the SOW." (Id. ¶ 44). On April 2, 2008, L-7 provided Old
Navy with its standard form license agreement and a term sheet,
which proposed: a three-year initial term; the number of Old
Navy stores at which the TODD OLDHAM branded products would be
launched; plans for subsequent expansion; the previously-agreed
upon royalty rate of 5%; and annual guaranteed minimum royalties.
(Id. ¶ 45 & Ex. 17). Thereafter, representatives of L-7 and Old
Navy communicated back and forth about the proposed licensing
agreement. (Id. ¶¶ 46, 48-51 & Exs. 18, 19, 20, 21, 22). On
June 12, 2008, L-7 told Old Navy in an email that, although the
parties had not yet finalized an agreement on a license, "things
are proceeding in the right direction in connection with the
branded line." (Id. ¶ 48 & Ex. 19). In part because "business
[had been] weaker th[a]n expected," Old Navy wanted to postpone
the launch and L-7 was prepared to do so, from October 1, 2008,
to February 1, 2008. (Id. Ex. 22).

        On September 30, 2008, Old Navy advised L-7 in a
telephone call for the first time that it wished to postpone the
signing of a license for the TODD OLDHAM marks indefinitely.
(Id. ¶ 52). After L-7's further efforts to pursue a licensing
agreement failed, on October 7, 2008, L-7 advised Old Navy that
Old Navy was in material breach of the CSA by failing to
negotiate in good faith and enter a licensing agreement. (Id. ¶
53 & Ex. 23). On November 10, 2008, outside counsel for L-7
"demand[ed] . . . payment from Old Navy to [L-7] in the amount of
$75 million, as compensation for lost royalties and reputational

damage," as well as $4 million for fees due under the CSA for the
second and third years of the agreement. (Id. ¶ 57 & Ex. 25).

Additional communications were exchanged, and
representatives of Old Navy and L-7 met several times in December
2008 and January 2009 "to work out the details of the license
agreement." (Id. ¶ 54-59, 60). On January 8, 2009, Old Navy
provided L-7 with a term sheet addressing all "open terms" in the
license. (Id. ¶¶ 60 & Ex. 27). Old Navy proposed a launch at
100 Old Navy stores; 89 product categories; a four-season
commitment; a sales goal of $30 million; marketing support of $1
million; and a one-year projected royalty of $1.5 million. (Id.
Ex. 27). The same day, L-7 responded that "100 stores will not
work. [T]he 1 million in launch dollars will not be effective.
[T]he one year commitment is too brief . . . ." (Answ. Ex. A).
In the discussions back and forth, L-7 asked for a minimum
guarantee of $37.5 million for a three-year term and then reduced
the request to $20 million for a two-year term. (Id. Ex. E; see
id. Exs. B-E).

On February 2, 2009, L-7 and Old Navy exchanged emails.
At 2:03:54 p.m., Old Navy advised L-7 that "after the many weeks
that we have devoted to explaining the scope and limitations of
an arrangement that could be acceptable, we continue to be
disappointed about where things stand. For reasons that we
repeatedly have tried to make clear to you, we cannot agree to
your proposed terms." (Compl. Ex. 27). At 8:09 p.m., L-7
responded as follows:

> on the 29th, you monika and I had our
> conference call during which you [Old Navy]
> explained your positions, I [L-7] explained
> ours, I responded openly to your concerns and
> as a result suggested further changes to our
> positions.  we both agreed that we will ask
> our respective principals for their input on
> these points.  I asked you if you wanted me
> to re-cap the conversation in an email and
> you said that it was not necessary and that
> you were all clear on everything.  we left
> off with the understanding that we made very
> good progress and while we agreed on most
> points, certainly the important ones, there
> remained a few points which were yet to be
> resolved.  none of these points was left off
> as a deal breaker, none of these points was
> presented by me as such.  we agreed at the
> end of the conversation to talk again this
> week after we will have spoken with out
> principals.  on the same day, I sent you an
> email outlining todd's input on the points we
> discussed below.

(Id.).  The email goes on to list items as to which L-7 contended

there was agreement, items that it was "now prepared" to accept,

two points that needed clarification ("personnel" and

"development budget"), and one issue "to be agreed to," that is,

ownership of "designs."  (Id.).[3]

### 4.   **The Negotiations Fail**

On February 6, 2009, Old Navy advised L-7 that material

"open issues" remained, and that, in light of the nature of the

_____

[3]      Citing this email, L-7 alleges in the Complaint that
"[o]n February 2, 2009, L-7 . . . accepted Old Navy's January 8,
2009 proposal in its entirety."  (Compl. ¶ 61 (citing Ex. 28)).
As the text of the email makes clear, however, this was not so.
Where a plaintiff's conclusory allegations are clearly
contradicted by documentary evidence incorporated into the
pleading by reference, the court is not required to accept them.
See Matusovsky v. Merrill Lynch, 186 F. Supp. 2d 397, 400
(S.D.N.Y. 2002).

negotiations, Old Navy did not believe that a "collaborative partnership" could be established. (Id. ¶ 62).

On February 18, 2009, L-7 commenced this lawsuit against Old Navy.

Two days later, on February 20, 2009, counsel for Old Navy sent L-7 a letter terminating the CSA on the grounds that L-7 had "materially breached the [CSA] by filing a lawsuit against Old Navy, by failing to provide meaningful input on design processes and procedures, by failing to participate meaningfully in meetings with the Old Navy creative team and by otherwise failing to perform its obligations under the CSA." (Id. ¶¶ 67, 68 & Ex. 29).

### 5.   **The Purported Trade Disparagement**

In or around February 2009, Old Navy commenced a campaign "designed to smear the reputation" of L-7 and Oldham by making "deliberately false statements" about L-7 and Oldham to the purchasing public. (Id. ¶¶ 77, 78).

On March 3, 2009, Women's World Daily magazine published an article, based on factually incorrect information provided by Old Navy. (Id. ¶ 79). The article quoted a spokesperson for Gap Inc. (the parent corporation of Old Navy), who said Old Navy was disappointed that Oldham decided to take a business disagreement to court. (Id. & Ex. 31). The article also said: "On Feb. 20, with little fanfare, Oldham left his post as creative director for the Old Navy brand, a post he'd taken on in October 2007." (Id.). The latter statement was

-8-

"utterly false," according to L-7, as Oldham continued to serve as Old Navy's creative director. (Id. ¶ 80).

On April 2, 2009, Women's World Daily magazine published another article, which contained "demonstrably false statements" by a Gap Inc. spokesperson. (Id. ¶ 81). The article stated that the spokesperson said that Gap Inc. would be able to defend itself against Oldham's suit, and that she stated that "Todd failed to provide any meaningful input in the design process as well as failed to meet contractual obligations." (Id. ¶ 81 & Ex. 32). The statement was false, according to L-7, because at no time did Oldham fail to provide meaningful input or meet contractual obligations. (Id. ¶ 82).

Old Navy purportedly made the statements to influence consumers not to purchase TODD OLDHAM branded products and to influence potential business partners, vendors, and retailers not to do business with L-7 and Oldham. (Id. ¶¶ 95-99).

## B. Prior Proceedings

The Complaint asserts five counts: Count I seeks a declaratory judgment declaring that Old Navy wrongfully terminated the CSA; Count II alleges trade disparagement under the Lanham Act, 15 U.S.C. § 1125(a)(1)(B), contending that Old Navy made false, disparaging remarks about Oldham to the press; Count III alleges breach of contract, contending that Old Navy failed to enter into a license agreement for the TODD OLDHAM marks; Count IV alleges a breach of the implied duty of good faith and fair dealing, contending that Old Navy failed to

-9-

negotiate a licensing agreement in good faith; and Count V alleges fraud, contending that Old Navy deceived L-7 from April 2008 through February 2009 by "its repeated false representations that it would enter into a licensing agreement governing the sale of the TODD OLDHAM branded line." (Compl. ¶ 118).

Old Navy answered and asserted counterclaims for breach of contract, contending that L-7 and Oldham failed to meet their obligations under the CSA, and for a judgment declaring that Old Navy met its contractual obligations while L-7 did not.

The parties were engaged in difficult and contentious discovery when Old Navy filed the instant motion for judgment on the pleadings.

## **DISCUSSION**

### A. **Motions for Judgment on the Pleadings**

Motions pursuant to Rule 12(c) for judgment on the pleadings are governed by the same standards applicable to Rule 12(b)(6) motions to dismiss for failure to state a claim upon which relief may be granted. See Cleveland v. Caplaw Enter., 448 F.3d 518, 521 (2d Cir. 2006). To survive a motion to dismiss pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).

The Supreme Court in Iqbal set out a "two-pronged" approach for courts considering a motion to dismiss. Id. at

-10-

1950. First, the court accepts plaintiff's factual allegations as true and draws all reasonable inferences in its favor. See id.; see also Vietnam Ass'n for Victims of Agent Orange v. Dow Chem. Co., 517 F.3d 104, 115 (2d Cir. 2008). The court considers only the factual allegations in the complaint and "any documents that are either incorporated into the complaint by reference or attached to the complaint as exhibits" or otherwise properly considered. Blue Tree Hotels Inv. (Can.), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc., 369 F.3d 212, 217 (2d Cir. 2004); see also Prentice v. Apfel, 11 F. Supp. 2d 420, 424 (S.D.N.Y. 1998) (citing Brass v. Am. Film Techs., Inc., 987 F.2d 142, 150 (2d Cir. 1993)). Legal conclusions must be supported by factual allegations. Iqbal, 129 S. Ct. at 1949. Pleadings that are "no more than conclusions are not entitled to the assumption of truth." Id. at 1950. "'[B]ald contentions, unsupported characterizations, and legal conclusions are not well-pleaded allegations,'" and will not defeat the motion. Gavish v. Revlon, Inc., No. 00 Civ. 7291 (SHS), 2004 WL 2210269, at *10 (S.D.N.Y. Sept. 30, 2004) (quoting Citibank, N.A. v. Itochu Int'l, Inc., No. 01 Civ. 6007 (GBD), 2003 WL 1797847, at *1 (S.D.N.Y. Apr. 4, 2003)).

Second, the court determines whether the allegations "plausibly give rise to an entitlement to relief." Iqbal, 129 S. Ct. at 1949. A plausible claim "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. at 1949

-11-

(citing Twombly, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." Id. (citing Twombly, 550 U.S. at 556). Determining plausibility is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Id. at 1950.

Accordingly, judgment on the pleadings is appropriate only if, drawing all reasonable inferences in favor of the non-moving party, it is apparent from the pleadings that no set of facts can be proven that would entitle the plaintiff to relief. Labajo v. Best Buy Stores, L.P., 478 F. Supp. 2d 523, 528 (S.D.N.Y. 2007).

## B.   The Merits

I consider each of the five counts of the Complaint, beginning with the most significant claim, Count III, and proceeding to Counts IV, I, II, and then V.

### 1.   Count III

Count III charges that Old Navy breached the CSA "by failing to negotiate in good faith and to enter into a license agreement." (Compl. ¶ 106). Hence, Count III really asserts two claims: Old Navy failed to negotiate a license agreement in good faith and Old Navy failed to enter into and execute a license agreement. I address the two claims in reverse order.

#### a.   Failure to Enter into Agreement

Old Navy argues that as a matter of law Count III fails to state a claim that Old Navy breached by failing to enter into

-12-

a license agreement because Section 5 of the SOW merely set forth an "agreement to agree," and it did not create a contractual obligation on Old Navy's part to launch a Todd Oldham branded line. (Def. Mem. at 1, 10-13). I agree.

Section 5 sets forth the type of preliminary agreement that "is binding only to a certain degree." Adjustrite Sys., Inc. v. GAB Bus. Servs., Inc., 145 F.3d 543, 548 (2d Cir. 1998); see also Vacold LLC v. Cerami, 545 F.3d 114 (2d Cir. 2008). With such a preliminary agreement, dubbed by Judge Leval a "binding preliminary commitment," "the parties are bound only to make a good faith effort to negotiate and agree upon the open terms and a final agreement; if they fail to reach such as final agreement after making a good faith effort to do so, there is no further obligation." Id. at 548 (quoting Teachers Ins. & Annuity Ass'n v. Tribune Co., 670 F. Supp. 491 (S.D.N.Y. 1987)). As explained in Adjustrite, a binding preliminary commitment:

> is created when the parties agree on certain
> major terms, but leave other terms open for
> further negotiation. The parties "accept a
> mutual commitment to negotiate together in
> good faith in an effort to reach final
> agreement." . . . In contrast to a fully
> binding preliminary agreement, a "binding
> preliminary commitment" "does not commit the
> parties to their ultimate contractual
> objective but rather to the obligation to
> negotiate the open issues in good faith in an
> attempt to reach the . . . objective withing
> the agreed framework." . . . A party to such
> a binding preliminary commitment has no right
> to demand performance of the transaction.
> Indeed, if a final contract is not agreed
> upon, the parties may abandon the transaction
> as long as they have made a good faith effort
> to close the deal and have not insisted on
> conditions that do not conform to the
> preliminary writing.

145 F.3d at 548 (quoting <u>Teachers Ins. & Annuity Ass'n</u>, 670 F. Supp. at 498).

In determining whether a preliminary agreement is a "binding preliminary commitment," courts consider the following factors:

> (1) the language of the agreement; (2) the context of the negotiations; (3) the existence of open terms; (4) partial performance; and (5) the necessity of putting the agreement in final form, as indicated by the customary form of such transactions.

<u>Arcadian Phosphates, Inc. v. Arcadian Corp.</u>, 884 F.2d 69, 72 (2d Cir. 1989).

Here, as a matter of law, Section 5 set forth what was merely a binding preliminary commitment by the parties to negotiate a licensing agreement in good faith. It did not set forth a fully binding preliminary agreement that bound the parties to their "ultimate contractual commitment."

First, the language of Section 5 unequivocally reflects an intent not to be fully bound until further agreement could be reached. L-7 and Old Navy explicitly agreed "that the specific terms and conditions related to this proposed line of products bearing TODD OLDHAM Marks <u>are to be negotiated and agreed upon by the parties in a separate agreement</u>." (SOW § 5(b) (emphasis added)). Second, the context of the negotiations makes clear that L-7 and Old Navy contemplated two aspects to the relationship: L-7 would provide creative design services, such as providing creative input on positioning, vision, and strategy,

for which L-7 would be paid a fee (SOW § 1; CSA § 2), and the parties would separately negotiate and agree on a license for a Todd Oldham branded line, for which L-7 would be paid a separate fee (SOW § 5; CSA § 2(a)). Third, L-7 and Old Navy agreed on only two terms -- a 5% royalty rate on Old Navy's retail sales for this particular line and final approval by both parties as to collections and products to be sold under the license. (SOW § 5(c)). Hence, the parties had not agreed on such material terms as (i) the term of the licensing agreement; (ii) the number of stores in which the branded line of products would be launched and sold; (iii) the products and product categories to be included; (iv) annual guaranteed minimum royalties (if any); and (v) the amount to be spent on marketing support. Fourth, the Complaint does not allege partial performance. Fifth, the proposed licensing agreement is "'the type of contract that is usually committed to writing.'" Adjustrite, 145 F.3d at 549 (quoting Winston v. Mediafare Entm't Corp., 777 F.2d 78, 80 (2d Cir. 1986)). It is inconceivable that sophisticated parties like L-7 and Old Navy would have entered into a substantial licensing agreement such as the CSA without a written, fully executed contract.

Consequently, I conclude that to the extent L-7 alleges a breach of Section 5 based on Old Navy's failure "to enter into a license agreement covering a TODD OLDHAM branded line of apparel" and its failure "to execute a license agreement" (Compl. ¶¶ 106, 107), Count III of the Complaint fails to state a claim

-15-

upon which relief can be granted. Even assuming the facts
asserted in the Complaint are assumed to be true, in light of the
plain wording of the CSA and SOW, L-7's allegations do not give
rise to a plausible claim for relief.

### b. **Failure to Negotiate in Good Faith**

Count III also alleges a breach of the CSA (and SOW) by
Old Navy's purported failure to negotiate a licensing agreement
in good faith. (Id. ¶ 106). As discussed above, Section 5
undoubtedly did create a obligation on the part of the parties to
negotiate a license agreement in good faith. Old Navy was free
to abandon the deal, but only if it first made an effort to
negotiate a license in good faith. In moving for judgment on the
pleadings, Old Navy argues, as a factual matter, that the
Complaint fails to allege any facts that would plausibly support
a finding of bad faith. Again, I agree.

The Complaint is unusual in the sense that it has
appended to it 33 exhibits, including many reflecting the
parties' negotiations over the terms of a license agreement.
With the Answer, Old Navy also submitted (appropriately so)
exhibits to fill in the record of the negotiations. Thus, the
Court has before it, as part of the record on a motion for
judgment on the pleadings, detailed documentation of the
negotiations between Old Navy and L-7 over the anticipated
license agreement. This record and the detailed allegations of
the Complaint show, unequivocally, that L-7's claim that Old Navy
failed to negotiate in good faith is not plausible.

According to L-7, negotiations began in early April 2008 and continued for some ten months, until February 2009. (Compl. ¶¶ 44-62). Hence, Old Navy negotiated for some ten months. The exhibits annexed to the pleadings show that the parties exchanged numerous telephone calls and emails, and, as L-7 acknowledged, progress in the negotiations was made. (Id. ¶ 48 & Ex. 19). In the fall of 2008, the parties seemed to reach an impasse and negotiations broke down (id. ¶¶ 48-55), but the parties resumed talks and met several times in December 2008 and January 2009 (id. ¶ 60). On January 8, 2009, Old Navy provided L-7 with a term sheet, proposing terms on the open items, but L-7 did not accept the proposal.

Moreover, L-7 was making extraordinarily high demands. At one point during the discussions, L-7 demanded (through outside counsel) $75 million in compensation for lost royalties and reputational damages. It later demanded a minimum guarantee of $37.5 million in royalties for a three-year term, which it then later reduced to $20 million for a two-year term. At the agreed upon 5% royalty rate, some $200 million in sales of Todd Oldham branded products would had to have been generated in one year to generate royalties of $10 million in a year. It is not surprising that Old Navy resisted these demands..

On the other hand, L-7's allegations that Old Navy failed to negotiate in good faith are conclusory in nature. L-7 does not cite any specific facts that would render the claim of bad faith plausible. (See Pl. Mem. at 20-21). See also Smith v.

-17-

N.Y. Presbyterian Hosp., No. 06 Civ. 4056 (NRB), 2007 WL 2142312, at *16 (S.D.N.Y. July 17, 2007) ("a contract claim asserting breach of the implied covenants of good faith and fair dealing does not survive a motion to dismiss when it is based only on generalized allegations and grievances," but rather "must allege the specific instances or acts that amounted to" bad faith under the contract). L-7 repeatedly alleges in conclusory fashion that Old Navy refused to negotiate in good faith (Pl. Mem. at 20-21, 22-23), but the documents attached to the Complaint show otherwise.

The only specific allegation made by L-7 in this respect is its assertion that Old Navy decided to "renege" on its own January 8, 2009, proposal, and that this decision "is itself damning evidence of [Old Navy's] bad faith." (Id. at 23). The documents attached to the pleadings, however, show that this assertion is not plausible. L-7 rejected key terms of Old Navy's January 8, 2009, proposal and made a series of counter-demands, including by emails dated January 8, 11, and 17, 2009. (See Answ. Exs. A-E). These counter-proposals constituted, in essence, a rejection of the January 8th proposal. See, e.g., Jericho Group Ltd. v. Midtown Dev., 820 N.Y.S.2d 241, 246-47 (1st Dep't 2006). L-7's purported acceptance of the January 8th proposal on February 2, 2009, clearly was not, as the Complaint alleges, an acceptance of the proposal "in its entirety." (Compl. ¶ 61). To the contrary, the February 2, 2009, email asked for clarification of two issues, noted "one remaining issue

-18-

to be agreed to," and asked for "any proposed edits [Old Navy] might have to the overall design concept." (Id. Ex. 28). Hence, there still was no meeting of the minds.

Nor can L-7 argue that Old Navy's refusal to agree to a minimum guarantee is evidence of bad faith. A party's refusal, even to a point of impasse, to agree to a particular term does not constitute bad faith. See Venture Assocs. Corp. v. Zenith Data Sys. Corp., 96 F.3d 275, 279 (7th Cir. 1996) (insisting on "terms to the point of impasse" not sufficient to show bad faith).

In short, L-7's conclusory assertions that Old Navy refused to negotiate in good faith are belied by the facts asserted in the Complaint and as reflected in the documents appended thereto. To the extent Count III alleges that Old Navy breached by failing to negotiate a license agreement in good faith, Old Navy's motion for judgment on the pleadings is granted.

## 2. **Count IV**

Count IV alleges a breach by Old Navy of the implied duty of good faith and fair dealing. In particular, Count IV alleges that Old Navy proposed all the material terms of a license agreement, L-7 accepted those terms on February 2, 2009, and then Old Navy reneged on February 6, 2009. (Id. ¶ 112).

Count IV is essentially identical to the second part of Count III, as both are based on the allegation that Old Navy failed to negotiate a license agreement in good faith. For the

-19-

reasons set forth in the discussion of Count III above, Count IV is dismissed as well. The Complaint fails to allege, as a factual matter, a plausible claim that Old Navy failed to negotiate in good faith.

### 3. **Count I**

In Count I, L-7 alleges that Old Navy wrongfully terminated the CSA by failing to provide L-7 with written notice of and an opportunity to cure. (Compl. ¶¶ 70, 71, 86-92). The claim fails as a matter of law.

Section 5 of the CSA provided that during the term of the CSA, "either party may terminate this Agreement, effective immediately upon notice thereof, in the event of a material breach of this Agreement that remains uncured after thirty (30) days written notice of the breach to the other party." (CSA § 5).

Old Navy did provide written notice of termination, in the form of its letter from counsel dated February 20, 2009. (Compl. ¶ 67 & Ex. 29). The letter advised that Old Navy "hereby terminates" the CSA. (Id. Ex. 29). Hence, Old Navy did provide written notice of termination.

Old Navy admits, however, that it did not give L-7 a 30-day cure period, but argues that it was relieved from this obligation on grounds of futility. A party is not required to adhere to a contractual provision requiring a cure period if doing so would be futile. Wolff & Munier, Inc. v. Whiting-Turner Contracting Co., 946 F.2d 1003, 1009 (2d Cir. 1991); see Allbrand

-20-

<u>Discount Liquors, Inc. v. Times Square Stores Corp.</u>, 399 N.Y.S.2d 700, 701 (2d Dep't 1977) (when one party "will not live up to the contract, the aggrieved party is relieved from the performance of futile acts").

Here, L-7 sued Old Navy on February 20, 2009. It is difficult to see how L-7 and Old Navy could have continued in their joint venture in these circumstances. Oldham could not very well continue to help Old Navy creatively, including with respect to public relations matters, while pursuing a lawsuit against Old Navy. (CSA § 1). Among other things, Oldham was supposed to, under the CSA, "[m]otivate, inspire, coach, and share vision, insight and passion with Old Navy's creative team," and he was supposed to "[p]rovide input" to Old Navy's president and leadership team. (<u>Id.</u>). It is difficult to imagine that Oldham could perform these duties after he sued Old Navy.

L-7 cites cases holding that it is not a breach of a contract to sue to determine the meaning of a contract or to enforce a party's interpretation of a term. (Pl. Mem. at 13 (citing, <u>e.g.</u>, <u>Bridgeport Music, Inc. v. Universal Music Group, Inc.</u>, 440 F. Supp. 2d 342, 345 (S.D.N.Y. 2006))). This case is different, as this was not a situation that could have been cured. L-7 had already sued, and no cure was practical. Even a withdrawal of the complaint -- and it is highly unlikely that L-7 would have withdrawn the complaint if Old Navy had sent it a notice to cure -- would not have undone the harm caused by the public filing of a lawsuit against Old Navy. A notice of cure

-21-

would have been futile. Moreover, even assuming the failure to give a cure period was a breach, in the context here it surely was not a material one. See Frank Felix Assocs., Ltd. v. Austin Drugs, Inc., 111 F.3d 284, 289 (2d Cir. 1997) ("for a breach of a contract to be material, it must 'go to the root of the agreement between the parties'") (quoting Septembertide Pub., B.V. v. Stein & Day, Inc., 884 F.2d 675, 678 (2d Cir. 1989)).

## 4. Count II

In Count II, L-7 asserts a claim for trade disparagement under 15 U.S.C. § 1125(a)(1)(B) based on purportedly false statements made by Old Navy purportedly to disparage Oldham. Only two statements are specified in the Complaint, however, and neither supports a plausible claim for trade disparagement.

To be actionable under the Lanham Act for trade disparagement, a defendant must make a "false or misleading representation of fact, which . . . in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities." 15 U.S.C. § 1125(a)(1)(B). To constitute "commercial advertising or promotion," a statement must be "commercial speech," made for the purpose of influencing consumers to purchase goods or services, and disseminated to the purchasing public. Gmurzynska v. Hutton, 355 F.3d 206, 210 (2d Cir. 2004). Commercial speech is "'speech which does no more than propose a commercial transaction.'" City of Cincinnati v.

-22-

_Discovery Network, Inc._ 507 U.S. 410, 422 (1993) (quoting _Bolger v. Youngs Drug Prods. Corp._, 463 U.S. 60, 66 (1983)). News or magazine articles usually are not commercial advertising or promotion, but are speech "traditionally granted full protection under the First Amendment." _Gmurzynska_, 355 F.3d at 210-11; accord _Boule v. Hutton_, 328 F.3d 84, 91-92 (2d Cir. 2003).

Whether a statement is actionable under the Lanham Act is a question of law, _Mr. Chow of New York v. Ste. Jour Azur S.A._, 759 F.2d 219, 224 (2d Cir. 1985), and thus it is appropriate for this Court to decide this issue on a motion for judgment on the pleadings.

Here, the first statement identified by L-7 -- "On Feb. 20, with little fanfare, Oldham left his post as creative director for the Old Navy brand, a post he'd taken on in October 2007." -- is not even attributed to Old Navy (or Gap Inc.). The statement appeared in a Women's Wear Daily article written by a reporter. Even assuming Old Navy was the source, the statement was not commercial speech, as it did more than merely propose a commercial transaction. Indeed, the statement was made in a piece entitled "Litigiously Yours," describing the lawsuit. The statement simply is not the basis for a Lanham Act claim.

Similarly, the second statement -- "Todd failed to provide any meaningful input in the design process as well as failed to meet contractual obligations." -- also is not commercial speech, as likewise it does more than propose a commercial transaction. Moreover, in context, it was clearly a

-23-

statement of opinion, again made in the context of a magazine article about a newsworthy event -- a lawsuit brought by Oldham against Old Navy. The statement merely parroted Old Navy's position in the lawsuit. Moreover, the article also notes that Oldham asserted claims of wrongful termination, breach of contract, and fraud against Old Navy. See 5 J. Thomas McCarthy McCarthy on Trademarks & Unfair Competition § 27:109.50 (4th ed. 2009) (public statements "emphasizing the strength" of a party's litigation position are generally considered inactionable "opinion about the probable outcome of the litigation"); Lewis Mgmt. Co. v. Corel Corp., 36 U.S.P.Q.2d 1534, 1539 (S.D. Cal. 1995) ("that a statement relates to the strength of one's position in litigation, and is made to persons who know of the litigation, militates strongly in favor of a finding that it was opinion").

The trade disparagement claim fails as a matter of law.

## 5. Count V

Finally, in Count V, L-7 alleges that Old Navy committed common law fraud by repeatedly falsely representing, from April 2008 through February 2009, that it would enter into a licensing agreement when it had no intention of doing so. The claim is meritless.

First, the CSA was entered into in September 2007, and whatever representations Old Navy made starting in April 2008 could not have induced L-7 to enter into the CSA. Second, the fraud claim is duplicative of the breach of contract claim; L-7

-24-

pleads no facts independent of the breach of contract claim. See Bridgestone/Firestone v. Recovery Credit Serv. Inc., 98 F.3d 13, 20 (2d Cir. 1996). Third, L-7 does not plead fraud with particularity, and does not identify the fraudulent statements with any specificity, including who made them, when they were made, and what was said. Fourth, "general allegations that defendant entered into a contract while lacking the intent to perform it" are insufficient to support [a fraud in the inducement] claim." New York Univ. v. Cont'l Ins. Co., 87 N.Y.2d 308, 318 (1995). Finally, as discussed above, L-7 has not plausibly alleged that Old Navy failed to negotiate in good faith, and the extensive documentation shows to the contrary that Old Navy did.

Count V is dismissed.

## CONCLUSION

For the reasons set forth above, Old Navy's motion for judgment on the pleadings is granted and the Complaint is dismissed, with prejudice and with costs.

Old Navy did not request relief on its motion with respect to its counterclaims, which include a claim, for example, that L-7 breached its obligations under the CSA. Old Navy shall advise the Court in writing within three business days whether it wishes to pursue the counterclaims, in light of the granting of its motion for judgment on the pleadings. If not, the Court will dismiss the counterclaims without prejudice to re-filing in the event L-7 appeals and this decision is reversed.

There is pending a motion by L-7 to compel discovery. The motion is denied as moot, although the motion may be renewed if Old Navy proceeds with its counterclaims and discovery is required.

SO ORDERED.

Dated:     New York, New York
           January 19, 2010

DENNY CHIN
United States District Judge