UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - -x

L-7 DESIGNS, INC.,                      :

               Plaintiff,      :      **OPINION**

       - against -               :      09 Civ. 1432 (DC)

OLD NAVY, LLC,                          :

            Defendant.      :

- - - - - - - - - - - - - - - - -x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: ___111___
DATE FILED: 8/29/2013

**APPEARANCES:**        (See last page)

**CHIN, Circuit Judge**

       In this case, plaintiff L-7 Designs, Inc. ("L-7") and defendant Old Navy, LLC ("Old Navy") entered into a Creative Services Agreement (the "CSA") whereby L-7 was to provide Old Navy with creative design services, including "input" on "creative positioning, creative vision and creative strategy." Old Navy moved for judgment on the pleadings. I granted the motion and dismissed the action. L-7 Designs, Inc. v. Old Navy, LLC, No. 09 Civ. 1432 (DC), 2010 WL 157494 (S.D.N.Y. Jan. 21, 2010) ("L-7 Designs I"). On appeal, the Second Circuit affirmed in part and vacated in part, and remanded two claims for further

proceedings.  L-7 Designs, Inc. v. Old Navy, LLC, 647 F.3d 419 (2d Cir. 2011) ("L-7 Designs II").

On remand, the parties completed discovery.  Old Navy now moves for summary judgment on the remaining two claims.  For the reasons that follow, the motion is granted in part and denied in part, as set forth below.

BACKGROUND

**A.    The Facts**

On a motion for summary judgment, the Court construes the evidence in the light most favorable to the non-moving party.  The following facts are drawn from the deposition transcripts, affidavits, declarations, and exhibits submitted by the parties.  Any conflicts in the evidence have been resolved in favor of L-7, the party opposing summary judgment.

**1.    The Parties**

L-7's principal, Todd Oldham, is an artist, designer, and television personality.  (Oldham Decl. ¶¶ 1-12).  He formed L-7 in 1989 to manage his design services and intellectual property rights.  (Id. ¶¶ 2-3).  Over the years, Oldham and L-7 marketed merchandise under the brand "TODD OLDHAM."  (Compl. ¶¶ 8, 9, 13).  L-7 owns certain federal registrations for the mark "TODD OLDHAM."  (Id. ¶ 19).

-2-

Old Navy, a subsidiary of Gap Inc., operates a chain of retail apparel stores, with more than a thousand stores throughout the United States and Canada.  (Id. ¶ 20).  In the spring of 2007, L-7 approached Old Navy to discuss the possibility of entering into a relationship with L-7, and Old Navy eventually agreed to engage the services of Oldham and L-7. (Oldham Decl. ¶¶ 14, 16-18).

### 2.   The CSA

On September 21, 2007, Old Navy and L-7 entered into the CSA.  (Weinberger Decl. Ex. 6).[1]  The CSA provided that L-7 would perform certain "Services" and provide certain "Deliverables" for Old Navy, as set forth in a "Scope of Work" (the "SOW") attached to the CSA.  (Id., CSA ¶ 1).

Pursuant to the SOW, Oldham was to provide services for Old Navy as "Design Creative Director," and L-7 was to be paid an annual consulting fee for three years (running through September 30, 2010) as well as certain bonuses.  (Id., SOW ¶¶ 1-2).  The CSA provided that the fees to be paid pursuant to the SOW covered all "Services and Deliverables" and "all ownership rights, assignments, licenses and transfers by [L-7] set forth herein."  (Id., CSA ¶ 2(a)).  The CSA gave Old Navy, for

---

[1]   By its terms, the CSA is governed by New York law.  (Weinberger Decl. Ex. 6, CSA ¶ 14).

example, the limited right to use the TODD OLDHAM marks in connection with the parties' "relationship" with each other. (Id., CSA ¶ 3(c)).  The CSA provided, however, that the fees were "not intended to cover payment for ownership rights, assignments, licenses and transfers related to the Todd Oldham branded line of products described in the SOW."  (Id., CSA ¶ 2(a)).

The CSA also established that the agreement would terminate after three years.  (Id., CSA ¶ 5).  In addition, within the three-year term, the CSA provided that "either party may terminate this Agreement, effective immediately upon notice therof, in the event of a material breach of this Agreement that remains uncured after thirty (30) days written notice of the breach to the other party."  (Id.).

3.   **The Licensing Agreement and Related Negotiations**

Section 5 of the SOW was entitled "Todd Oldham Branded Line," and it provided as follows:

> a.   In September 2007, the parties will announce publicly that Todd Oldham/[L-7] shall be serving as Design Creative Director of Old Navy and that it is the intent of the parties to develop and launch a line of products that will bear TODD OLDHAM Marks to be sold exclusively at Old Navy stores at a future time.

      b.   [L-7] and Old Navy acknowledge and agree that the specific terms and conditions related to this proposed line of products bearing TODD OLDHAM Marks are to be negotiated and agreed upon by the parties in a separate agreement.  The parties plan to enter into a separate agreement related to these products by October 1, 2008.

      c.   The parties agree that this separate agreement will contain at least the following:  (1) royalty fees paid to [L-7] of 5% of Old Navy's retail sales for this particular line only (not all Old Navy products) and (2) agreement and final approval by both Old Navy and [L-7] as to the collections and products to be sold by Old Navy.

(Id., SOW ¶ 5).  By these provisions, the parties entered into a binding preliminary agreement, that is, "a mutual commitment to negotiate together in good faith in an effort to reach final agreement."  L-7 Designs II, 647 F.3d at 430 (quoting Teachers Ins. & Annuity Ass'n of Am. v. Tribune Co., 670 F. Supp. 491, 498 (S.D.N.Y. 1987)).

      On September 21, 2007, Old Navy issued a press release announcing that it was going to launch a "TODD OLDHAM" branded line of products.  (Oldham Decl. Ex. 6).  Thereafter, L-7 and Oldham performed their obligations under the CSA, and Old Navy executives gave positive feedback.  (Oldham Decl. ¶¶ 31-32).

In April 2008, L-7 and Old Navy began negotiations to
finalize the numerous open terms of the license agreement for
the "TODD OLDHAM" branded line of merchandise, as required under
Section 5 of the SOW.  (Id. ¶¶ 24, 33; Vayness Decl. ¶ 16).  On
April 2, 2008, L-7 provided Old Navy with its standard form
license agreement and a term sheet, which proposed:  a three-
year initial term; a general launch and distribution plan for
the "TODD OLDHAM" branded products; plans for subsequent
expansion; the previously agreed upon royalty rate of 5%; and
unspecified annual guaranteed minimum royalties.  (Vayness Decl.
¶ 16, Ex. 7).  Thereafter, representatives of L-7 and Old Navy
communicated back and forth about the proposed licensing
agreement.  (Id. ¶¶ 17-20, 22, Exs. 8-15).  On June 12, 2008, L-
7 told Old Navy in an email that, although the parties had not
yet finalized an agreement on a license, "things are proceeding
in the right direction in connection with the branded line."
(Van Auken Decl. Ex. 80).

By September 2008, however, in part because business
had been weaker than expected, L-7 was aware that Old Navy
wanted to postpone the deadline for reaching a licensing
agreement.  (Weinberger Decl. Ex. 33).  At this point, five
months after L-7's initial April 2 offer, Old Navy had not yet
responded with a counterproposal in writing.

-6-

Then, on September 30, 2008, Old Navy advised L-7 in a telephone call for the first time that it wished to postpone the signing of a license for the "TODD OLDHAM" marks indefinitely. (Vayness Decl. ¶ 19, Ex. 14; Oldham Decl. ¶ 40).  After L-7's further efforts to pursue a licensing agreement failed, on October 8, 2008, L-7 advised Old Navy that Old Navy was in material breach of the CSA by failing to negotiate in good faith and enter a licensing agreement.  (Vayness Decl. Ex. 14).  On November 10, 2008, outside counsel for L-7 "demand[ed] . . . payment from Old Navy to [L-7] in the amount of $75 million, as compensation for lost royalties and reputational damage," as well as $4 million for fees due under the CSA for the second and third years of the agreement.  (Id. ¶ 25, Ex. 17).

Notwithstanding the threat of a lawsuit, L-7 and Old Navy returned to the negotiating table.  Additional communications were exchanged, and representatives of Old Navy and L-7 conferred several times in December 2008 and January 2009 "to work out the details of the license agreement."  (Id. ¶¶ 27, 33, 36, 41-45).  On January 8, 2009, Old Navy provided L-7 with a term sheet addressing all "open terms" in the license.  (Id. ¶ 42, Ex. 24).  Old Navy proposed a launch at 100 Old Navy stores; 89 product categories; a four-season commitment; a sales goal of $30 million; marketing support of $1

million; a one-year projected royalty of $1.5 million, and no
minimum royalty guarantee.  (Id. Ex. 24).  The same day, L-7
responded that "100 stores will not work.  [T]he 1 million in
launch dollars will not be effective.  [T]he one year commitment
is too brief . . . ."  (Weinberger Decl. Ex. 45).  After
discussions back and forth, L-7 significantly lowered its
requested minimum from $37.5 million over three years to $2.25
million over two years.  (Vayness Decl. Ex. 23; Van Auken Decl.
Ex. 117; Weinberger Decl. Ex. 52).

On February 2, 2009, Old Navy advised L-7 that "after
the many weeks that we have devoted to explaining the scope and
limitations of an arrangement that could be acceptable, we
continue to be disappointed about where things stand.  For
reasons that we repeatedly have tried to make clear to you, we
cannot agree to your proposed terms."  (Vayness Decl. Ex. 26).
L-7 responded as follows:

> on the 29th, you monika and i had our
> conference call during which you [Old Navy]
> explained your positions, i [L-7] explained
> ours, i responded openly to your concerns
> and as a result suggested further changes to
> our positions.  we both agreed that we will
> ask our respective principals for their
> input on these points.  i asked you if you
> wanted me to re-cap the conversation in an
> email and you said that it was not necessary
> and that you were all clear on everything.

> we left off with the understanding that we
> made very good progress and while we agreed
> on most of the points, certainly the
> important ones, there remained a few points
> which were yet to be resolved.  none of
> these points was left off as a deal breaker,
> none of these points was presented by me as
> such.  we agreed at the end of the
> conversation to talk again this week after
> we will have spoken with our principals.  on
> the same day, I sent you an email outlining
> todd's input on the points we discussed.
> (see below)

(Id.).  The email goes on to list items as to which L-7

contended there was agreement, items that it was "now prepared"

to accept (including entirely forgoing a minimum royalty

guarantee), two points that needed clarification ("personnel"

and "development budget"), and one issue "to be agreed to," that

is, ownership of "designs."  (Id.).

    4.   **The Negotiations Fail**

       On February 6, 2009, Old Navy advised L-7 that

material "open issues" remained, and that, in light of the

nature of the negotiations, Old Navy did not believe that a

"collaborative partnership" could be established.  (Weinberger

Decl. Ex. 68).

       On February 18, 2009, L-7 commenced this lawsuit

against Old Navy.

Two days later, on February 20, 2009, counsel for Old Navy sent L-7 a letter terminating the CSA on the grounds that L-7 had "materially breached the [CSA] by filing a lawsuit against Old Navy, by failing to provide meaningful input on design processes and procedures, by failing to participate meaningfully in meetings with the Old Navy creative team and by otherwise failing to perform its obligations under the [CSA]." (Oldham Decl. Ex. 18).

B.    **Prior Proceedings**

The first amended complaint (the "Complaint") asserted five counts:  Count I sought a declaratory judgment declaring that Old Navy wrongfully terminated the CSA; Count II alleged trade disparagement under the Lanham Act, 15 U.S.C. § 1125(a)(1)(B), based on allegedly false and disparaging remarks that Old Navy made about Oldham to the press; Count III alleged breach of contract, contending that Old Navy failed to enter into a license agreement for the TODD OLDHAM marks and failed to negotiate the contract in good faith; Count IV alleged a breach of the implied duty of good faith and fair dealing, asserting that Old Navy failed to negotiate a licensing agreement in good faith; and Count V alleged fraud, contending that Old Navy deceived L-7 from April 2008 through February 2009 by "its repeated false representations that it would enter into

-10-

a licensing agreement governing the sale of the TODD OLDHAM branded line." (Compl. ¶ 118). Old Navy answered and asserted counterclaims for breach of contract, contending that L-7 and Oldham failed to meet their obligations under the CSA, and for a judgment declaring that Old Navy met its contractual obligations while L-7 did not.

I granted Old Navy's motion for judgment on the pleadings and dismissed all of L-7's claims; on appeal, the Second Circuit affirmed in part and vacated in part, reinstating Counts I and III. See L-7 Designs II, 647 F.3d 419. The Second Circuit concluded that L-7 had plausibly alleged that Old Navy had failed to negotiate in good faith. Id. at 431-34. It also held that my determination that "'it is highly unlikely that L-7 would have withdrawn the complaint if Old Navy had sent it a notice to cure'" was speculative, L-7 Designs II, 647 F.3d at 434-35 (quoting L-7 Designs I, 2010 WL 157494 at *10). The Court of Appeals also disagreed with my conclusion that withdrawal of the complaint "'would not have undone the harm caused by the public filing of a lawsuit against Old Navy'" because L-7's two complaints were filed under seal. L-7 Designs II, 647 F.3d at 435 (quoting L-7 Designs I, 2010 WL 157494 at *10.

-11-

The parties had engaged in limited discovery before the appeal, see id. at 427, and on remand, they completed discovery.  Old Navy moved for summary judgment.  The proceedings were delayed when L-7's counsel moved for leave to withdraw and the parties engaged in, unsuccessfully, settlement negotiations.  I now decide the motion.

## DISCUSSION

**A.    Summary Judgment Standard**

The standards governing motions for summary judgment are well settled.  A court may grant summary judgment only where there is no genuine issue of material fact and the moving party is therefore entitled to judgment as a matter of law.  See Fed R. Civ. P. 56(c); accord Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 585-87 (1986).  Summary judgment must be denied "if the evidence is such that a reasonable jury could return a verdict in favor" of the non-moving party.  See NetJets Aviation, Inc. v. LHC Commc'ns, LLC, 537 F.3d 168, 178-79 (2d Cir. 2008).

In deciding a motion for summary judgment, the Court must construe the evidence in the light most favorable to, and draw all reasonable inferences in favor of, the non-moving party.  In re "Agent Orange" Prod. Liab. Litig., 517 F.3d 76, 87 (2d Cir. 2008).  The non-moving party cannot, however, "escape

summary judgment merely by vaguely asserting the existence of some unspecified disputed material facts, or defeat the motion through mere speculation or conjecture." W. World Ins. Co. v. Stack Oil, Inc., 922 F.2d 118, 121 (2d Cir. 1990) (internal citation and quotation marks omitted).

The role of the Court on a motion for summary judgment is not to ask whether "the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the [non-moving party] on the evidence presented." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). Because the Court's role is limited in this respect, it may not make factual findings, determine credibility of witnesses, or weigh evidence. See Jeffreys v. City of N.Y., 426 F.3d 549, 554 (2d Cir. 2005); Hayes v. N.Y.C. Dep't of Corr., 84 F.3d 614, 619 (2d Cir. 1996); United States v. Rem, 38 F.3d 634, 644 (2d Cir. 1994).

B.   **Failure To Negotiate in Good Faith**

As the Second Circuit noted, section 5 of the SOW created a binding preliminary agreement to negotiate the license agreement in good faith. See L-7 Designs II, 647 F.3d at 430. The parties agree, however, that Old Navy could abandon the deal as long as it first made a good faith effort to reach an agreement. (Def.'s Mot. for Summ. J. 15-16; Pl.'s Opp'n 20

-13-

(citing <u>L-7 Designs II</u>, 647 F.3d at 430-31)).  L-7 contends that Old Navy breached the CSA and SOW "by failing to negotiate in good faith."  (Compl. ¶ 106).  Old Navy moves for summary judgment on this claim.  For the reasons described below, with respect to the failure to negotiate claim, I grant Old Navy's motion for summary judgment.

### 1.  Applicable Law

Under New York law, "a binding preliminary agreement is one that expresses mutual commitment to a contract on agreed major terms, while recognizing the existence of open terms that remain to be negotiated."  <u>Teachers Ins. & Annuity Ass'n of Am. v. Tribune Co.</u>, 670 F. Supp. 491, 498 (S.D.N.Y. 1987).  With this sort of agreement, "the parties are bound only to make a good faith effort to negotiate and agree upon the open terms and a final agreement; if they fail to reach such a final agreement after making a good faith effort to do so, there is no further obligation."  <u>Adjustrite Sys., Inc. v. GAB Bus. Servs., Inc.</u>, 145 F.3d 543, 548 (2d Cir. 1998).  It is possible, then, that no contract will be finalized if, for example, the parties encounter "good faith differences in the negotiation of the open issues" or "lose interest as circumstances change."  <u>Tribune Co.</u>, 670 F. Supp. at 498.

In the context of the obligation to negotiate in good faith pursuant to a preliminary binding agreement, the parameters of what constitutes good faith, or bad faith, are not clearly delineated.  See 1 Arthur Linton Corbin, On Contracts § 2.8 (rev. ed. 1993).  Some generalizations, however, can be drawn.  First, at the very least, good faith requires "honesty in fact."  6 id. § 26.8; cf. A.I. Trade Finance, Inc. v. Laminaciones de Lesaca, S.A., 41 F.3d 830, 837 (2d Cir. 1994) (citing UCC, as adopted by New York).  Negotiations conducted in good faith encompass an "honest[] articulation of interests, positions, or understandings."  Penguin Grp. (USA) Inc. v. Steinbeck, No. 06 Civ. 2438 (GBD), 2009 WL 857466, at *2 (S.D.N.Y. Mar. 31, 2009); see also TVT Records v. Island Def Jam Music Grp., 244 F. Supp. 2d 263, 277 (S.D.N.Y. 2003) ("'The boundaries set by the duty of good faith are generally defined by the parties' intent and reasonable expectations in entering the contract.'" (quoting Cross & Cross Props., Ltd. v. Everett Allied Co., 886 F.2d 497, 502 (2d Cir. 1989) (describing covenant of good faith and fair dealing))).

Second, the duty to negotiate in good faith obligates a party only to try to reach an agreement; a party does not act in bad faith merely because, in the end, it refuses to capitulate to the other side's demands.  See Steinbeck, 2009 WL

-15-

857466, at *2; 6 Corbin, supra, § 26.8 (citing Robert S. Summers, "'Good Faith' in General Contract Law and the Sales Provisions of the Uniform Commercial Code," 54 Va. L. Rev. 195, 202-03 (1968)); cf. Zilg v. Prentice-Hall, Inc., 717 F.2d 671, 681 (2d Cir. 1983) (with respect to duty to promote in good faith, finding of bad faith is inappropriate "unless the plaintiff proves that the motivation underlying those decisions was not a good faith business judgment").

Third, "[s]elf-interest is not bad faith." Venture Assocs. Corp. v. Zenith Data Sys. Corp., 96 F.3d 275, 279 (7th Cir. 1996). Acting in one's financial self-interest, for example, in response to market changes, does not constitute bad faith. Id.

Fourth, bad faith requires some "deliberate misconduct" -- arbitrary or capricious action taken out of spite or ill will or to back out of an otherwise binding contractual commitment. See Venture Assocs., 96 F.3d at 279. For example, a party acts in bad faith if it "'renounce[s] the deal, abandon[s] the negotiations, or insist[s] on conditions that do not conform to the preliminary agreement.'" L-7 Designs II, 647 F.3d at 430 (quoting Tribune Co., 670 F. Supp. at 498). Thus, "trying to scuttle the deal" or to take advantage of expenditures made by the other side to advance the project may

-16-

constitute bad faith, depending on the circumstances.  <u>See</u>
<u>Venture Assocs.</u>, 96 F.3d at 279-80 (raising price for asset sale
to induce opposing party to reject deal distinguished from
merely raising price in light of asset's increased market
value), <u>cited with favor in</u> <u>L-7 Designs II</u>, 647 F.3d at 433. <u>See</u>
<u>generally</u> E. Allan Farnsworth, "Precontractual Liability and
Preliminary Agreements:  Fair Dealing and Failed Negotiations,"
87 Colum. L. Rev. 217, 273-85 (1987) (describing instances of
unfair dealing during negotiation process by drawing comparisons
to other bodies of law).

  In the end, however, "[a] primary concern for courts
in such disputes is to avoid trapping parties in surprise
contractual obligations that they never intended." <u>Tribune Co.</u>,
670 F. Supp. at 497.  Where negotiations fail for bona fide
business reasons, the duty to negotiate in good faith should not
operate to elevate a binding preliminary agreement into a full-
blown contract.  <u>See</u> <u>Venture Assocs.</u>, 96 F.3d at 281 (Cudahy,
concurring) (acknowledging "paradox" of "foist[ing] the peculiar
and special consequences of an agreement on parties who have not
in fact agreed" in light of the "many perfectly legitimate
reasons for negotiations to fail, even if good faith prevails").

2.   **Application**

Based on the record as developed through discovery, I
conclude that summary judgment is warranted on this claim.
First, I conclude that a reasonable jury could only find that
Old Navy had engaged in lengthy and meaningful negotiations with
L-7.  The evidence indisputably shows that Old Navy negotiated
with L-7 on and off for approximately ten months, exchanging
emails and phone calls with L-7 from early April 2008 until
February 2009.  (Vayness Decl. ¶¶ 16-47, Exs. 7-16, 18, 21, 23,
26).  Indeed, L-7 acknowledged in July 2008 that the parties
were making progress in the negotiations.  (See Vayness Decl.
Ex. 26 (after phone call between L-7 and Old Navy on January 29,
2009, parties "left off with the understanding that we made very
good progress"), Ex. 9 (stating that L-7 was "looking forward
. . . to finishing . . . negotiations regarding the branded
line")).

In early September 2008, Old Navy requested postponing
the October 1, 2008 target for entering into a licensing
agreement.  (Weinberger Decl. Ex. 30).  Shortly thereafter, Old
Navy informed L-7 that it would no longer be able to enter into
a licensing agreement due to "the business challenges facing Old
Navy." (Vayness Decl. Ex. 15).  The parties, however, resumed
negotiations in early December 2008.  (Id. Ex. 21).  Old Navy

-18-

described this meeting as "productive" and involving "a positive exchange of views and ideas." (Id.). Moreover, Old Navy specifically assured L-7 in a December 9, 2008, email that it "remain[ed] prepared to continue discussions concerning the appropriate terms and approach for a future launch of a [Todd Oldham branded] line and would be open to continuing [the] discussions at [L-7's] convenience." (Vayness Decl. Ex. 21). It subsequently provided L-7 with a written proposal on January 8, 2009. (Weinberger Decl. Ex. 40).

Although Old Navy may have been slow to fully respond to L-7's April 2008 proposal (see Pl.'s Opp'n 21-22), and negotiations certainly stopped and started, on this record, a jury could only conclude that Old Navy's negotiations with L-7 were repeated and ongoing. Indeed, L-7 was caught by "complete surprise" when the negotiations were terminated in February 2009 -- a strong indication that Old Navy had been participating actively and responsively. (Vayness Decl. Ex. 26 (L-7 "caught . . . by complete surprise [given that previous phone call regarding the branded line] was completely amicable, polite, professional, [and] friendly")).

Second, a reasonable jury could only conclude that Old Navy's January 8, 2009 proposal was a legitimate and substantial offer. Old Navy offered L-7 an opportunity to launch the Todd

-19-

Oldham branded line in 100 stores for four seasons, beginning in Spring 2010, with an initial marketing budget of approximately $1 million. (Weinberger Decl. Ex. 40). Old Navy would not hire additional personnel for the branded line, but its staff would be available to L-7, and L-7 would provide Old Navy with design proposals whose aesthetic would align with Old Navy's target customers. (Id.). And, in accordance with the SOW (Weinberger Decl. Ex. 5, SOW ¶ 5(c)), Old Navy offered a five percent royalty rate, which it predicted would generate approximately $1.5 million for L-7 over the course of the first year, although the proposal did not contemplate a minimum royalty guarantee (id.). A reasonable jury evaluating Old Navy's proposal, offering Oldham a significant market for his designs and L-7 an opportunity to earn in excess of $1.5 million on the merits of those designs, could only view this proposal as a legitimate offer.

Third, even assuming that, as L-7 asserts, Old Navy changed its mind about entering into a license agreement for the branded line, a reasonable jury could only find that the decision was motivated by Old Navy's legitimate business concerns. For one, the company's management changed significantly as Old Navy purged many of its senior employees. (See, e.g., Van Auken Decl. Exs. 8, 59-61, 91; Weinberger Decl.

Ex. 18).  Moreover, in addition to the general economic malaise,
Old Navy had experienced several years of poor sales.
(Weinberger Decl. Ex. 19, at 227:18-21, 229:1-21; Vayness Decl.
Ex. 16, Ex. 19 ¶ 23).  Finally, between the time when Oldham
first joined Old Navy and when the parties began to negotiate
the licensing agreement for the branded line, Old Navy had re-
assessed its target customer, moving from a young, cheeky,
fashionista to "Jenny and Mike" -- cost-conscious parents
shopping for the family.  (Weinberger Decl. Ex. 9 at 237:12-
238:9; Van Auken Decl. Ex. 7, at 238:15-23; Van Auken Decl. Ex.
5, at 227:18-229:21).  In light of its internal leadership
tumult, the realities of its own financial performance (and that
of the market generally from 2008 to 2009), and the course
correction it made with respect to its target consumer, Old Navy
was understandably reticent to commit to a new, untested product
line.  Furthermore, L-7 has presented no evidence to show that
Old Navy acted with malice or ill will or for any reason other
than its own financial self-interest.  Hence, a reasonable jury
could only find that independently, and certainly viewed in the
aggregate, these legitimate business reasons were what prompted
Old Navy to proceed with caution and prudence when negotiating
with L-7.  Cf. Zilg, 717 F.2d at 681 (publisher satisfied duty

to promote with good faith when making decisions solely based on "good faith business judgment").

Nevertheless, L-7 makes several arguments to support its claim that Old Navy negotiated in bad faith. It first asserts that Old Navy made material misrepresentations by indicating that its legal team was reviewing the licensing agreement in May 2008 and by promising to follow up on L-7's initial proposal. L-7 contends that these misrepresentations were employed to avoid entering into the license agreement (see Am. Compl. ¶ 121) and presents some evidence that Old Navy wanted to hedge its bets.[2] But this evidence actually indicates that, while Old Navy was certainly assessing its options, Old Navy had made no clear decision on Oldham in mid-2008. (Van Auken Decl. Exs. 78-79 (Wyatt suggests "slow[ing] down" negotiations and "not pursuing the branded line"); id. Ex. 87

---

[2]      Beginning in May 2008, just one month after L-7 had submitted its first written proposal, senior Old Navy executives (including then-Old Navy acting president Tom Wyatt) had discussed "slow[ing] down" negotiations and "not pursuing the branded line." (Van Auken Decl. Exs. 78-79; id. Ex. 6, at 192-93, 276-79). Old Navy recognized, however, a need to "keep [Oldham] engaged until we show a couple quarters of traction." (Id. Ex. 87). In mid-June 2008, while Old Navy was purportedly engaged in negotiations with L-7 with respect to the Todd Oldham branded line, an email indicated that executives were ambivalent about Oldham's long-term future with Old Navy: "[Gap, Inc. president] Glenn [K. Murphy] shares our concern on the external message if we were to make a change [with Todd]. . . . And he strongly recommends we not make an[y] changes until we see the comps in August September which is his product. If acceptance is strong, we need to figure out how to keep him and fully utilize him. If it's not, we need to think about plan B." (Van Auken Decl. Ex. 8; see also id. Ex. 7, at 257:11-258:13).

(acknowledging need to "keep [Oldham] engaged until we show a couple quarters of traction"); id. Ex. 7, 257:11-258:13 (acknowledging executives were considering a "Plan B" that included terminating Oldham's contract)). Indeed, the evidence shows that Old Navy was still considering the possibility of completing a deal with L-7, but first wanted to see how sales fared. Any financial impact due to Oldham's input during the creative process would have only been apparent beginning in August and September. (See Van Auken Decl. Ex. 8; id. Ex. 7, at 256:19-257:10). The sales, however, were ultimately deemed disappointing. (See id. Ex. 5, at 245:23-247:10).

It is hard to perceive how Old Navy's failure to disclose internal discussions regarding Oldham and the branded line before having made a final decision on those issues constituted a material misrepresentation. Cf. Farnsworth, supra, at 234 (party should be liable in tort if, "having lost [the] intent [to reach agreement], continues in negotiations or fails to give prompt notice of its change of mind" but noting law of misrepresentation rarely applied to failed negotiations). Moreover, once Old Navy learned that Oldham's creative input had no impact on its sales figures, it informed L-7 that it no longer wished to pursue the licensing agreement due to pressing "business challenges." (Vayness Decl. Ex. 15). In light of the

-23-

foregoing, a reasonable jury could only find that Old Navy had
not materially misrepresented its interest in reaching an
agreement in mid-2008.  See Tribune Co., 670 F. Supp. at 497
("mere participation in negotiations and discussions does not
creating binding obligation" and courts should "avoid trapping
parties in surprise contractual obligations").

Second, L-7's argument that Old Navy's January 2009
proposal was unreasonable and designed to elicit a rejection
must fail.  This assertion rests partly on the fact that Old
Navy's proposal insisted on no minimum royalty guarantees even
though early indications during negotiations had arguably
suggested that this issue was not of significant importance to
Old Navy.  (Van Auken Decl. Ex. 78 (identifying need, during
early discussions, to clarify with Oldham "new customer and
brand strategy" and "gifting strategy and the apparel line under
the branded name")).  L-7 also presents evidence that, as late
as December 3, 2008, Old Navy's outside counsel had not
identified minimum royalty guarantees as an "essential issue[]"
to be resolved.  (Id. Ex. 20 (noting that "differences emerged
in the parties' positions, including on such essential issues as
the types of products to be included in the line, how many
stores would be included in a launch, the staffing necessary to

support such a line, and, most importantly, the timing of any such launch" (emphasis added))).

Negotiations, however, are an evolving process, and as parties resolve certain points, other points gain greater importance.  Old Navy, understandably, would have wanted to ensure that Oldham was on board with Old Navy's creative vision and revised customer and product strategy before it discussed financial details premised on a mutual understanding of those goals.  Similarly, a reasonable jury could only find that the amount of a minimum royalty guarantee  -- _i.e._, the precise millions of dollars that a financially struggling retail company would be obliged to pay each year -- could only be a point of interest to Old Navy, even if it were not explicitly identified as such.  Moreover, the evidence clearly indicates that Old Navy considered, and rejected, the extent of minimum royalty guarantees initially proposed by L-7.  (Weinberger Decl. Ex. 15 (Old Navy notes reflect intent to "push back on minimum; he is already getting a minimum"); Ex. 17 ("Todd . . . had initially discussed fairly sizeable minimums which I [Doug Howe] would advise against.")).

Although L-7's arguments may have been sufficient to state a claim at the pleadings stage, with the benefit of a full record, it is now clear that the assertion that Old Navy's

proposal was made in bad faith because it was "designed to be economically unfair to L-7 so that L-7 would reject it" has no merit.[3] L-7 Designs II, 647 F.3d at 433 (citing Venture Assocs., 96 F.3d at 280).[4] Hence, a reasonable jury could only find, on the fuller record now before the Court, that, even assuming Old Navy had intended to offer a proposal that would be rejected by L-7, its decision was motivated by the legitimate business concerns facing the company, see Farnsworth, supra, at 282 (noting that it "may not . . . be a breach of an agreement to negotiate . . . to back out on the ground of an unexpected drop in [] earnings"), and not any malice or animosity toward L-7 or Oldham in particular, see Venture Assocs., 96 F.3d at 279 ("The agreement to negotiate does not contain the terms of the final agreement.  Otherwise it would be the final agreement.").

---

[3]    Further, describing Old Navy's proposal as "economically unfair" is undermined by L-7's desire to ultimately accept a similar proposal, as described below.

[4]    The Second Circuit relied on Venture Associates Corp. v. Zenith Data Sys. Corp. when concluding that a deal proposed so as to elicit a rejection from the other party was evidence of bad faith.  L-7 Designs II, 647 F.3d at 433 (citing Venture Assocs., 96 F.3d 275, 279-80 (7th Cir. 1996)).  The Seventh Circuit, however, also emphasized that a party's change in negotiating position that was prompted by evolving business circumstances -- even if it knew that the opposing party would no longer agree to a deal on those terms -- was not evidence of bad faith.  See Venture Assocs., 96 F.3d at 279-80 ("[Defendant] was free to demand as high a price as it thought the market would bear, provided that it was not trying to scuttle the deal, or to take advantage of costs sunk by [plaintiff] in the negotiating process.  The qualification is vital.  If the market value of [the asset for sale] rose, say, to $25 million, [defendant] would not be acting in bad faith even if it knew that [plaintiff] would not go so high." (internal citation omitted)).

Third, L-7 contends -- erroneously -- that evidence of Old Navy's bad faith is apparent in its refusal to honor the terms of its January 8, 2009 proposal.  L-7 initially responded to Old Navy's offer with two counteroffers (Weinberger Decl. Exs. 45, 47, 51), thereby rejecting the January 8 offer.  See Jericho Grp. Ltd. v. Midtown Dev., 820 N.Y.S.2d 241, 246-47 (1st Dep't 2006) ("[I]t is a fundamental tenet of contract law that a counteroffer constitutes a rejection of an offer as a matter of law.").  Of course, L-7 was not obliged to accept any proposal advanced by Old Navy; it was entitled to assess frankly the probability that the branded line would succeed, weigh the relative risks of pursuing the branded line without a minimum royalty guarantee or proceeding solely on the merits of Oldham's contributions to the branded line, and, if it so desired, attempt to negotiate terms more favorable.

Old Navy, too, was under no obligation to cede to L-7's demands, but was entitled to make measured decisions in its own business interest.  See Steinbeck, 2009 WL 857466, at *2 ("The linchpin of negotiation is not that one side capitulates to the other, but that there is a good faith, honest, articulation of interests, positions, or understandings.").  In addition, to the extent that L-7's counterproposals bridged some of the distance between the parties' respective positions, it

-27-

did not follow that, merely by failing to fully close the gap, Old Navy acted in bad faith.  Cf. Zilg, 717 F.2d at 681 (publisher satisfied duty to act in good faith when making decisions based on "good faith business judgment").

Furthermore, Old Navy's January 8, 2009 proposal was not a commitment or even a tentative agreement, and Old Navy had a good reason to withdraw that proposal.  Although L-7 eventually agreed to most of the terms, it did not do so until several weeks later.  (Weinberger Decl. Ex. 53 (on February 2, 2009, L-7 agrees to terms in substance as described in Old Navy's proposal and suggests that Old Navy propose new language for particular provisions if L-7's language is not amenable)).  Old Navy was not obliged to hold its offer (which had already been rejected -- twice) open in perpetuity.  That the parties failed to reach an agreement here is not, as a matter of law, grounds for concluding that Old Navy's negotiations were not in good faith.  See Adjustrite, 45 F.3d at 548.

Finally, L-7 also asserts that Doug Howe, then an executive vice president with Old Navy, after consulting with counsel, had told L-7 that Old Navy could fulfill its obligation to negotiate in good faith merely by proposing intentionally undesirable terms to L-7.  The only evidence it presented of this allegation was a declaration by an agent of L-7 and an

email from L-7 disagreeing with the statement allegedly made.[5]
Even assuming that Howe made this statement, amidst the wealth
of evidence that Old Navy negotiated in good faith, a single
offhand remark is insufficient to raise a triable question of
material fact.  Furthermore, to the extent L-7 points to an
email by Old Navy's counsel indicating that Old Navy was not
obliged to continue negotiating a licensing agreement for the
branded line (Vayness Decl. Ex. 15 (describing the CSA as
providing "only for an agreement to agree to a future separate
license agreement" and, while open to discussing the branded
line "in the future if business conditions permit, we are not
currently in a position to make a commitment to any such future
discussions")), that legal advice did not stop Old Navy from
returning to the negotiating table.  If anything, this evidence
establishes Old Navy's good faith:  it continued to negotiate
even though it was told by counsel (right or wrong) that it was
under no obligation to do so.

---

[5]   See Vayness Decl. ¶ 20 (recounting conversation); id. at Ex. 14
(Vayness reporting that L-7 "would consider [Old Navy's] attorney's point of
view that old navy could therefore deliberately (so as to appear as if it
were fulfilling its obligation to launch the line) make the collection small
and consequently insignificant in its scope (or in any other manner propose
terms which cannot be reasonably acceptable to us), to be in bad faith.").
But see Weinberger Decl. Ex. 20, at 274 (Howe testifies at deposition that he
"[couldn't] imagine saying that").

For the foregoing reasons, and because none of L-7's arguments creates a material question of fact, I conclude that, as a matter of law, Old Navy did not violate its duty to negotiate in good faith.  Old Navy's motion for summary judgment is therefore granted with respect to this claim.

## C.  Wrongful Termination

As described above, I had previously dismissed L-7's claim of wrongful termination of the CSA on Old Navy's motion for judgment on the pleadings.  See L-7 Designs I, 2010 WL 157494 at *10.  On appeal, the Second Circuit reversed, finding that L-7 had sufficiently stated a claim that Old Navy (1) had violated the notice-and-cure provision of the CSA and therefore its termination letter did not operate to terminate the CSA, and (2) had wrongfully sought to terminate the CSA.  See L-7 Designs II, 647 F.3d at 434-35.  On remand, the parties completed discovery.  In light of the totality of evidence presented, I deny Old Navy's motion for summary judgment as to the wrongful termination claim, except to the extent set forth below.

### 1.  Materiality of L-7's Breach of the CSA

Section 5 of the CSA states that, while the CSA was in effect, "either party may terminate this [CSA], effective immediately upon notice thereof in the event of a material breach of this [CSA] that remains uncured after thirty (30) days

written notice of the breach to the other party." (Weinberger
Decl. Ex. 6, ¶ 5). Hence, except at the conclusion of the
three-year term of the CSA, the CSA only permitted the parties
to terminate the agreement in the event of a material breach.

On February 20, 2009, Old Navy sought to terminate the
CSA, asserting that L-7 had materially breached the CSA by
filing a lawsuit against Old Navy and by failing to perform its
obligations under the CSA. (Oldham Decl. Ex. 18). L-7 contends
that the breaches alleged were not material and, therefore, Old
Navy's attempt to terminate the CSA was wrongful.

Under the CSA, Oldham was supposed to "[m]otivate,
inspire, coach, and share vision, insight and passion with Old
Navy's creative team." (CSA § 1). Thus, Oldham was
contractually required to provide Old Navy with input on
creative matters and strategy, and to advise Old Navy's
leadership team. Although the complaints were filed under seal,
Old Navy was, of course, aware of the allegations, and the
pleadings were sure to (and did) become public. It is difficult
to imagine, under these circumstances, that Oldham could
meaningfully perform his duties under the CSA after he had sued
Old Navy and had accused it and its executives of bad faith,
fraud, and deceit.

Nevertheless, L-7 has presented evidence that it still could have had a productive relationship with Old Navy. It is undisputed that, notwithstanding prior obstacles to a constructive working relationship, the parties were able to continue working side by side. For example, when L-7 accused Old Navy of bad faith in October 2008 and then brought in outside counsel to demand $75 million in "compensation" plus an additional $4 million in fees, Oldham continued to consult for Old Navy. Moreover, although Old Navy and L-7 had put negotiations for the licensing agreement on hold, they thereafter returned to the negotiating table, and tried to reach an agreement before discussions broke down for good in February 2009.

Moreover, Old Navy executives and staff widely praised Oldham during the course of their relationship. See L-7 Designs II, 647 F.3d at 434; Learning Annex Holdings, LLC v. Whitney Educ. Grp., Inc., 765 F. Supp. 2d 403, 417 (S.D.N.Y. 2011) (SAS) (noting that "a number of statements indicating that [defendant] appreciated [plaintiff's] efforts and enjoyed working with [plaintiff]" undermined any argument that defendant had "terminated the business relationship as a result of good faith differences in business philosophies"). (See also Van Auken Decl. Ex. 94 (email from Murphy to Oldham referencing "our new

-32-

product flow, that you brought to life"); Oldham Decl. Ex. 12

(collecting various emails complimentary to Oldham dated from

October 27, 2008 to January 13, 2009 from various Old Navy

executives and employees)).

In light of the foregoing, and after construing the

evidence in the light most favorable to L-7, I conclude that L-7

has identified material questions of fact as to whether Oldham

materially violated his obligations under the CSA and whether

filing a lawsuit materially undermined Oldham's ability to

satisfy his obligations to Old Navy under the CSA.  See, e.g.,

Frank Felix Assocs., Ltd. v. Austin Drugs, Inc., 111 F.3d 284,

289 (2d Cir. 1997) ("Under New York law, for a breach of a

contract to be material, it must go to the root of the agreement

between the parties." (internal quotation marks omitted)).  It

is possible that a reasonable juror could find that L-7's filing

of the complaint constituted a breach of the CSA by preventing

adequate collaboration between Oldham and the Old Navy

executives with whom he was to work.  It is likewise possible,

however, that a reasonable juror could find that L-7's lawsuit

was merely an attempt to clarify the meaning of the CSA.  See

Prudential Equity Grp., LLC v. Ajamie, 538 F. Supp. 2d 605, 611-

12 (S.D.N.Y. 2008) ("[B]ringing suit to determine the meaning of

an agreement is not a breach of that agreement absent some

explicit contractual provision that the party will not bring suit."). Hence, L-7 has identified material questions of fact as to whether it materially breached the CSA. See Anderson, 477 U.S. at 252 (summary judgment not warranted where "fair-minded jury could return a verdict for the plaintiff on the evidence presented").

2.   **Notice and Opportunity To Cure**

Under Section 5 of the CSA, assuming a party materially breached the CSA, termination would be effective if the breach remained "uncured after thirty (30) days written notice of the breach to the other party." (Weinberger Decl. Ex. 6, CSA ¶ 5). Old Navy provided written notice of termination, in the form of its letter from outside counsel dated February 20, 2009 (Oldham Decl. Ex. 18), but it did not first provide L-7 with thirty days to cure the alleged material breaches.

Old Navy contends that, even if a jury would conclude that L-7 had materially breached the CSA, it was relieved of the obligation to provide a cure period because any such notice would have been futile. See Wolff & Munier, Inc. v. Whiting-Turner Contracting Co., 946 F.2d 1003, 1009 (2d Cir. 1991) (holding party not required to adhere to contractual provision requiring cure period if doing so would be futile); Allbrand Discount Liquors, Inc. v. Times Square Stores Corp., 399

-34-

N.Y.S.2d 700, 701 (2d Dep't 1977) (when one party "will not live up to the contract, the aggrieved party is relieved from the performance of futile acts").  I agree.

As described above, the undisputed evidence establishes the following:  The parties engaged in prolonged, detailed, and difficult negotiations over the terms of the licensing agreement.  The parties were unable to come to an agreement.  L-7 then sued Old Navy in February 2009, alleging that Old Navy had acted in bad faith and accusing the very executives he was supposed to advise of fraud and deceit.  L-7 hired a major law firm to file suit in federal court, setting forth detailed allegations in a complaint appended with hundreds of pages of exhibits.  In light of the foregoing, it is hard to imagine that L-7 would have withdrawn its complaint merely because Old Navy asked it to do so.

Furthermore, L-7 has presented no evidence that, provided proper notice, it would have withdrawn the complaint.  Oldham testified that he did not know whether he would have withdrawn the complaint "[i]f Old Navy had asked [him] to . . . as being a breach of the creative services agreement." (Weinberger Decl. Ex. 9 at 303:7-11).  Moreover, when Old Navy asked Oldham "[w]hat factors might have led [him] to withdraw the complaint" had it so requested, Oldham's counsel objected

and instructed Oldham not to answer on the grounds that those issues were speculative and "no longer before the court." (Id. at 303:15-304:15).[6]  Thus, the record provides no support for the assertion that L-7 would have withdrawn the complaint, and L-7 would not be permitted at trial to offer evidence for the first time that it would have done so.  See Palazzo ex rel. Delmage v. Corio, 232 F.3d 38, 43-44 (2d Cir. 2000) (testimony contradicting party's deposition inadmissible at hearing absent new evidence); cf. Raskin v. Wyatt Co., 125 F.3d 55, 63 (2d Cir. 1997) ("'[A] party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony.'" (quotation omitted)).  While, on the pleadings alone, it might have been speculative to conclude that L-7 would not have withdrawn its complaint, see L-7 Designs II, 647 F.3d at 434-35, under the record as developed through discovery, only the unsupported assertion that L-7 would have withdrawn its complaint can be deemed speculative.

Thus, there is no evidence to suggest that L-7 would have cured the alleged material breaches as required under the contract.  I hold, therefore, that as a matter of law, Old Navy

---

[6]      Old Navy did not file a motion to compel this testimony.

was excused from its obligation to give notice and an opportunity to cure and its failure to provide such notice, as a matter of law, did not constitute a breach of the CSA. See Wolff & Munier, Inc., 946 F.2d at 1009 (excusing compliance with contract provision if "strict adherence" to that provision would have been "useless act").

Nevertheless, the fact remains that, unless L-7 materially breached the CSA, Old Navy's termination of the CSA would have been wrongful. Because, as discussed above, L-7 has raised material questions of fact as to whether it had breached the CSA, Old Navy's motion for summary judgment on the wrongful termination claim is denied. I hold as a matter of law, however, that assuming Old Navy had sufficient grounds to terminate the CSA, its failure to provide L-7 with an opportunity to cure will be excused.

D. **Damages**

Old Navy argues that it is entitled to summary judgment on the amount of damages because L-7 failed to substantiate its claim for damages. For example, Old Navy alleges that L-7 failed to cooperate during discovery and refused to provide tax returns and other information that would bear on its damages. (Def. Mem. in Supp. at 23-25). In opposition, L-7 argues that it detailed its damages in its

-37-

responses to interrogatories and other discovery requests, but
it does not deny that it refused to answer certain of Old Navy's
requests for discovery regarding purportedly lost income. (See
Pl. Mem. in Opp. at 19-20). Moreover, it asserts that its
damages figures are undisputed and that, in any case, it was
under no duty to mitigate damages because it was an independent
contractor (rather than an employee). (See id.).

        L-7's response is inadequate. First, in breach of
contract cases generally, the duty of the injured party to
mitigate its damages is well established. See, e.g., Drummond
v. Morgan Stanley & Co., No. 95 Civ. 2011 (DC), 1996 WL 631723,
at *2 (S.D.N.Y. Oct. 31, 1996) ("It is well settled that a
plaintiff who suffers injury as the result of a breach of
contract is under a duty to mitigate damages; if he or she fails
to do so, any award of damages will be reduced 'by any
unnecessary increase in damages due to the failure of the
plaintiff to avoid them.'" (quoting U.S. W. Fin. Servs., Inc. v.
Marine Midland Realty Credit Corp., 810 F. Supp. 1393, 1402
(S.D.N.Y. 1990))); Holy Props. v. Cole Prods., 87 N.Y.2d 130,
133 (1995) ("The law imposes upon a party subjected to injury
from breach of contract, the duty of making reasonable exertions
to minimize the injury."). This rule applies even where the
injured party is not an employee but a contractor. See, e.g.,

Donald Rubin, Inc. v. Schwartz, 594 N.Y.S.2d 193 (1st Dep't 1993) (where contractor was relieved of his obligation to perform services, he was required to produce "tax returns and other information pertinent to mitigation of damages"); 22 Am. Jur. 2d, Damages § 34 at 57 ("gains which were or could have been received by the nondefaulting party by entering into another contract or transaction should be used in reducing damages caused by a breach of contract promise only where the breach gave rise to an opportunity to enter into those other contracts or transactions").  Thus, L-7 clearly had a duty mitigate its damages.

Second, L-7 had a duty to produce documents and other documents relating to its claim of lost income and other damages (as well as discovery related to its efforts to mitigate those damages).  It cannot simply say, for example, in responses to interrogatories, that these are our damages.  Old Navy was entitled to test the calculations, to probe L-7's assertions, and to insist on back-up and proof.  Readex Microprint Corp. v. General Aniline & Film Corp., 74 N.Y.2d 613, 618 (1947) ("A plaintiff seeking compensatory damages has the burden of proof and should present to the court a proper basis for ascertaining the damages he seeks to recover.  They must be susceptible of ascertainment in some manner other than by mere conjecture or

-39-

guesswork."). Old Navy did not, however, move to compel L-7 to provide discovery, and the discovery deadline has long passed.

In light of the foregoing, although L-7 may present evidence of damages at trial, it may _only_ offer proof of damages that it has previously produced in discovery. Of course, Old Navy has the right to object to the admissibility of any such evidence.

## CONCLUSION

For the reasons set forth above, Old Navy's motion for summary judgment is granted in part and denied in part. The Court will hold a status conference on September 11, 2013, at 11:00 a.m.

SO ORDERED.

Dated:   New York, New York
         August 29, 2013

_____
DENNY CHIN
United States Circuit Judge
Sitting by Designation

-40-

**APPEARANCES**

Attorneys for plaintiff L-7 Designs, Inc.:[7]

> WINSTON & STRAWN LLP
>     By:  Virginia R. Richard, Esq.
>         Lori van Auken, Esq.
>         Lana C. Marina, Esq.
> 200 Park Avenue
> New York, New York  10166

Attorneys for defendant Old Navy, LLC:

> FROSS ZELNICK LEHRMAN & ZISSU, P.C.
>     By:  James D. Weinberger, Esq.
>         Anna Leipsic, Esq.
> 866 United Nations Plaza
> New York, New York  10017
>
>                 - and -
>
> DURIE TANGRI LLP
>     By:  Daralyn J. Durie, Esq.
>         Joshua H. Lerner, Esq.
>         Eugene Novikov, Esq.
> 217 Leidesdorff Street
> San Francisco, California  94111

---

[7]     Plaintiff was represented by Winston & Strawn LLP when the present motion was briefed.  Thereafter, the firm moved for leave to withdraw.  I granted the request, and the case was taken over for plaintiff by Denise Savage of the Savage Law Group.